# CHARLESTON.

## PINKNEY *v.* KANAWHA VALLEY BANK.

Submitted February 17, 1910.   Decided November 29, 1910.

1.  BANKS AND BANKING—*Deposit of Check for Collection—Right of Collecting Bank.*

    If the holder of a check indorses it, and deposits it for credit and collection in another bank, the collecting bank, if the check is not paid, and it is without fault in forwarding it for payment, has the right, on its return, to charge it back to its customer or recover the amount if he has in the mean time withdrawn the money.

2.  SAME—*Collection of Checks—Liability to Depositor.*

    The general rule is that if a collecting bank forwards a check directly to the drawee bank, and by custom or agreement it is authorized to credit the collecting bank and remit, or settle at stated periods, its receipt of the check, debiting it to drawer and crediting it to the collecting bank constitutes payment, and renders the forwarding bank liable to its principal for the amount thereof.

3.  SAME.

    Such would be the effect of the transaction whether there was sufficient cash in the bank at the moment to pay the check, or it be afterwards discovered that the check was an overdraft, and the drawee insolvent.

4.  SAME—*Forwarding Paper for Presentment—Time.*

    The qualification of the general two day rule, allowed for forwarding paper for presentment is, that if there be more than one mail on the second day it need not go by the first, but, if there be but one, it must go by it, unless it leave or close at an unreasonably early hour. The whole of the second day is not allowed, unless the last mail of that day goes at the close

of business. Approving *Lewis, Hubbard & Co.* v. *Supply Co.,* 59 W. Va. 75.

5. SAME—*Collection of Paper—Negligence.*

A collecting bank, knowing of the depressed financial condition of the debtor, is delinquent in its duty if it neglects to inform its customer of such vital condition, and fails to take vigorous measures under the circumstances to secure payment, and if loss occurs by its negligence to exercise that degree of skill, care and diligence which the nature of its undertaking calls for, with reference to the time, place and circumstances surrounding the undertaking, it will incur liability to its principal for the loss sustained.

6. SAME—*Checks—Collection—Negligence.*

The general rule to which there are few, if any, exceptions, is that it is negligence for a collecting bank to send checks direct to a drawee bank. The drawee bank who is to pay the check is not a suitable agent for its collection.

7. SAME.

And the fact that the drawee bank is the only bank at the place where it is located constitutes no exception to the general rule.

8. SAME—*Checks—Collection—Negligence—Effect of Custom.*

The custom of the banks at the place where the collecting bank is located, of sending checks to a drawee bank, will not justify the sending of a check directly to a drawee. Custom cannot justify negligence.

9. SAME—*Checks—Collection—Negligence of Collecting Bank—Form of Action.*

Where a collecting bank is negligent in transmitting a check for collection, and in forwarding it to the drawee bank, whereby such drawee, though in disregard of a special agreement, is enabled to debit the drawer of the check and credit the collecting bank, and control of the check is lost by the collecting bank and it is never returned to the customer, the latter may in an action of *assumpsit,* upon the common counts as for money had and received, recover the full amount of the check.

Error to Circuit Court, Kanawha County.

Action by Edward Pinkney against the Kanawha Valley Bank. Judgment for defendant, and plaintiff brings error.

*Reversed, and New Trial Awarded.*

*S. S. Green, B. W. Moore,* and *Littlepage, Cato & Bledsoe,* for plaintiff in error.

68 W. Va.

*Brown, Jackson & Knight,* for defendant in error.

MILLER, JUDGE:

In an action in *assumpsit,* upon the common counts, and bill of particulars filed, plaintiff seeks recovery of a balance alleged to be due him from defendant. The bill of particulars consists of deposits debited and credits for checks paid, beginning February 5, 1900, with balance $1,797.17, and covering other deposits ranging from $33.33 to $204.38, and concluding September 25, 1900, with a debit of $2,500.00. On the other side the account is credited September 25, "By check to Dent Bros. of this date, 2500.00." The balance, $2,130.34, is the amount sued for.

The defense was *non-assumpsit,* and sets-off with specifications of sets-off filed, as follows: "September 25, 1900. To check of this date given by Dent Bros. to Edward Pinkney for the amount of $2,500.00, on the Montgomery Banking & Trust Company, endorsed by Edward Pinkney, and delivered by him to Kanawha Valley Bank for collection, and credited, and by said Kanawha Valley Bank credited to said Pinkney, conditioned on the same being paid, but which Montgomery Banking & Trust Company failed and refused to pay. $2,500.00."

On the trial, on the issues joined on these pleas, and after the evidence on both sides had been introduced and the parties had rested, the jury, as instructed by the court on motion of the defendant, found the following verdict: "We, the jury, upon the issues joined find for the defendant, and that the true state of indebtedness between the parties shows that the plaintiff is indebted to the defendant in the sum of $369.66. We therefore find for the defendant in the sum of three hundred and sixty nine dollars and sixty six cents." On this verdict, the court below, overruling plaintiff's motion to set the verdict aside as contrary to the law and the evidence, and grant him a new trial, pronounced the judgment complained of, that the defendant recover of the plaintiff the said sum of $369.66, interest and costs.

The facts out of which this controversy arose are as follows: Dent Bros. and Pinkney, residing at Montgomery, where the drawee bank was located, by arrangements made September

24, exchanged checks September 25. The same day Dent Bros. sent Pinkney's check to a Charleston bank for credit to them, and Pinkney sent their check, the one involved here, to the defendant for credit to his account. The Montgomery Banking & Trust Company, drawee of the Dent Bros. check, was the only banking institution at that point. Prior to that time the defendant had had a special arrangement with the Montgomery bank for making collections, requiring remittances every Saturday, but this arrangement, as Dickinson swears, had been changed some three weeks before the transaction in question, the new agreement requiring the bank to remit whenever collections aggregated $500.00.

The defendant received from Pinkney the Dent Bros. check, indorsed by him, September 25, about two o'clock P. M., and the letter enclosing it requested that it be placed to his credit. After being opened, the letter and check, along with other items, were laid aside by Dickinson for attention the following day. The next day, Dickinson, before forwarding the check for collection, phoned to Champe, the president, at Montgomery, to come to Charleston for consultation. Champe arrived about noon, saw Dickinson, who explained to him that his bank had this check of Dent Bros. for collection, and credit to Pinkney, but that he was unwilling to forward it to the Montgomery bank, unless assured that that bank was in a condition to send currency in payment. Champe professing to be ignorant about the actual condition of his bank, but expressing the opinion that it was all right and that the check would be paid, agreed to return to Montgomery, make an investigation and telephone Dickinson. About nine o'clock that evening, he did telephone Dickinson the message "O. K.", meaning, as arranged, that he had found his bank could and would send the money for the check. Dickinson, having held the check all that day, on receipt of this message, at once enclosed it and a letter of advice, printed form, in an envelope addressed to the drawee bank at Montgomery, and shortly afterwards deposited it in the post office at Charleston. The printed form of this letter said: "We enclose for credit", but plainly written below, the letter said: "Kindly ship us currency for above on No. 3", meaning No. 3, C. & O. train arriving at Charleston about noon. At the same time Dickinson wrote Pinkney on a printed form,

advising him of the receipt of the check and saying: "Your favor of the 25th inst. with stated inclosure received. We credit your account, $2500. Thank you. X Foreign items credited subject to payment." The letter to the bank reached Montgomery by the mail leaving Charleston about 3 A. M. of the morning of September 27, and was actually delivered to the bank at the opening of the bank that morning. The check was not otherwise presented for payment to the bank that day. The money was not sent as requested by defendant's letter of advice, but instead was some time that day debited to Dent Bros. and credited to the Kanawha Valley Bank. Champe, was at the bank that morning when the bank opened, saw the check, was there several times afterwards during the day to see if a deposit which Sims, a director had gone after, and out of which it was intended to pay this Dent Bros. check, had arrived, the last time about 12 o'clock M., and the deposit not arriving, he returned to Charleston, reaching there about 2 o'clock P. M., explained to Dickinson the condition of the bank, and why the money had not been sent, consulted counsel, and as a result, on application, a receiver of the bank was appointed, and the bank closed. The defendant bank that evening sent an attorney to Montgomery to try and get the Dent Bros. check. On arriving he went to the bank, made demand for the check, with a view to making demand for payment, and if not paid to have it protested. But Coleman, in charge of the bank, refused his demand, giving some reason, probably that it had passed through the books, or had been charged to Dent Bros. and credited to the defendant. At all events the check was not recovered, protested or returned to Pinkney, but after the receiver was appointed was returned to Dent Bros., as a paid and cancelled check. The next day, the 28th, Dickinson wrote Pinkney, also Dent Bros., at Montgomery, advising them that the check had been duly presented, payment demanded and refused, of which he had been advised that morning, and to do what they might think necessary to protect their interests. These are substantially all the material facts on which the rights of the parties depend.

It is not and can not be successfully controverted that if the holder of a check indorses and deposits it for credit and collection in another bank, the collecting bank, if the check is not

paid, and it is without fault in forwarding and presenting it for payment, has the right on its return to charge it back to its customer, or recover the amount of it, if he has in the mean time withdrawn the money. 1 Bolles Mod. Law of Banking, 210. It is not pretended that defendant ever actually got the money on the Dent Bros. check, except by way of credit by the drawee bank.

Plaintiff's claim of right to credit for the check is based on several grounds or theories: First, it is said that because of the alleged agency of the Montgomery bank, its act in debiting Dent Bros. and crediting the Kanawha Valley Bank, amounted in law to payment of the check, binding the latter to account to Pinkney, its customer; second, and whether the first proposition be correct or not, that owing to the condition of the drawee bank, known to defendant and disclosed by the record, greater diligence was required of it in the collection of the check, than is ordinarily required, and that its act in holding the check all of the afternoon of September 25, and all of the following day, and until after all the mails for Montgomery had departed, without notice to or the knowledge of Pinkney, or Dent Bros., made it guilty of gross negligence, rendering it liable to account to plaintiff, and precluding it from charging back the check, even if it had not parted with the check, but had presented it for payment, and protested it for non-payment; third, that by forwarding the check directly to the drawee bank, especially under the circumstances disclosed, and suffering and enabling that bank to dispose of the check as was done, defendant was guilty of such negligence also as will preclude it from charging back the check, or recovering any part of it from Pinkney.

Is plaintiff's first proposition correct? The authorities cited by plaintiff's counsel do hold, as a general rule, that if a collecting bank forwards a check directly to the drawee bank, and by custom or agreement it is authorized to credit the collecting bank and remit, or settle at stated periods, its receipt of the check, debiting it to drawer and crediting it to the collecting bank, constitutes payment, and renders the forwarding bank liable to its principal for the amount thereof. *Briggs* v. *Central National Bank,* 89 N. Y. 182 (42 Am. Rep. 285) ; *Smith Roofing Co.* v. *Mitchell,* 117 Ga. 772 (45 S. E. 47), citing 2

Morse on Banks and Banking, section 451; *Merchants National Bank* v. *Goodman,* 109 Pa. St. 422; *Montgomery Co.* v. *Cochran,* 126 Fed. Rep. 456. "This effect", says the court in the latter case, "cannot, we think, depend on there being cash enough in the bank at the moment the check is presented to pay it." And, says the court again, "can the effect of the deposit of the check be limited by the financial condition of the bank on settlement of all its business transactions? It can not, we think, for obvious reasons." "The effect would be the same", says the supreme court of Alabama, "though it be afterwards discovered that the check was an overdraft and the drawee insolvent." *Bank of Selma* v. *Burns,* 68 Ala 267 (44 Am. Rep. 138). Is this general rule applicable here? While there is proof of prior arrangement between the Montgomery bank and defendant, the transaction here was the subject of special agreement, and taken entirely out of that agreement. Defendant would not and did not agree to send the check here involved to the Montgomery bank for payment and credit to its account. The forwarding of the check by mail for presentment and payment was the subject of special agreement, and as between the parties to that agreement the Montgomery bank had no right to debit Dent Bros. and credit the defendant bank. Did its act in doing so, its breach of that contract, amount to payment of the check, binding the defendant, and rendering it liable to account for the amount as if in fact collected? The answer to this question, we think, depends on the disposition to be made of plaintiff's other propositions in which it is involved.

Now as to plaintiff's second proposition: In *Lewis, Hubbard & Co.* v. *Supply Co.,* 59 W. Va. 75, a case between the drawer and payee of a check of the same date, drawn on this same Montgomery bank, and sought to be collected in the same way, this Court has held, in accordance with the general doctrine obtaining in this country, that "A person receiving a check, on a fund in the hands of a bank, for the amount of a demand against the drawer thereof, is bound to exercise reasonable diligence in making presentment thereof for payment, if he wishes to avoid risk of loss by insolvency of the drawee"; that, "if the payee of the check and the drawee reside, or have their places of business, in the same city or town, presentment must be made before the expiration of business hours of the day next after the

day of the receipt thereof"; that, "if the person receiving a check and the bank on which it is drawn are in different places, it must be forwarded, for presentment, by mail or other usual mode of transmission, on the next day after the receipt thereof at the place in which the payee resides or does business, if reasonably and conveniently practicable; and, if not so practicable, then by the next mail or other similar means of conveyance, leaving after said date;" that, "neither payee nor his agent is required to transmit such check by the only, or last, mail of the day next after its receipt, if such mail closes or departs at an hour so early as to render it inconvenient for the holder to avail himself of it"; that, "the parties to a check drawn on a bank and sent to a distant place to be forwarded for presentation, are deemed in law to have acted with knowledge of the usual diligent method of making such presentment through a bank at the place to which it is sent, and to have agreed to suffer any reasonable delay incident to such mode of presentment;" that, "in such case, the drawer, by allowing his funds to remain in the drawee bank, and the payee, by accepting the check, evince belief in the solvency of the bank, and the former voluntarily takes the risk of its solvency during the reasonable period necessary for presentment of the check in the usual manner." Other rules more or less applicable to the present case are also promulgated in the cases as cited. On the trial, and as pertinent to the proposition under consideration, it was stipulated by counsel, that mails left Charleston for Montgomery each day about 3:00 A. M., 9:30 A. M., and 6:26 P. M., due to arrive at Montgomery about three quarters of an hour later; and that mails left Montgomery for Charleston about 2:00 A. M., 11:30 A. M. and 4:30 P. M., and requiring about the same time to reach Charleston; that mails leaving Charleston were closed about thirty minutes before the time of departure.

The question is then presented, was defendant negligent either in not forwarding the check immediately on its receipt on September 25, or by either of the mails going to Montgomery on September 26, or in not sending a special messenger to Montgomery with the check, or declining to accept it for credit and collection, and returning it to Pinkney? In the *Lewis, Hubbard & Co. Case,* as appears from the opinion at page 78, 79, the

proof was 'that two daily mails left Charleston for Montgomery, one reaching Montgomery. about six A. M., the other between ten and eleven A. M. Accordingly it was said in that case, after reviewing the authorities, page 81-2, "The way to a conclusion would seem to be perfectly clear but for the circumstance of there being no mail from Charleston to Montgomery on the afternoon of * * * the last day allowed by the rule for forwarding the check to Montgomery. Did this circumstance make it necessary to forward the check in the mail leaving Charleston at about nine or ten o'clock A. M.? If not, and it was allowable to deposit it in the postoffice within business hours on Wednesday, it could not have reached Montgomery until Thursday." After some general observations applicable here, the opinion then says: "Hence, the two-day rule, allowed for forwarding notices or paper for presentment, is subject to this qualification, namely, that it must be sent by the mail of the second day. If there be more than one mail on that day, it need not go by the first; but, if there be but one, it must go by it, unless it leave or closes at an unreasonably early hour. The whole of the second day is not allowed, unless the last mail of that day goes at the close of business. To this point, the American authorities seem to be unanimous." In this case it was stipulated that there was an afternoon mail leaving Charleston for Montgomery about 6:26 P. M., and it is conceded that the check involved here was not forwarded by that mail. So that, by these rules, defendant was certainly negligent in not forwarding the check by the last mail of that day. The answer it makes to this proposition is that matter sent by that mail would reach Montgomery too late for delivery that day, and that matter deposited in the post office in time for the 3 A. M. mail the next morning would reach Montgomery before business hours of that day, and would be delivered with matter sent on the last mail of the preceding day. Is this a sufficient answer to the charge of negligence in not complying with a positive rule of commercial law, violated by it? We think not. Was defendant otherwise negligent as suggested in the question? That Dickinson, the cashier, knew the Montgomery bank was in bad condition is evidenced by the new agreement made with it a short time before; and that he was unwilling that this check should go forward subject to that agreement, although, the

check being over $500.00, immediate remittance would have
been required; and by the fact that he sent for Champe, the
president, and made a special agreement about this check.
Dickinson thinks he tried to communicate with Pinkney. He
is not sure, and his testimony leaves it in doubt whether this
was on the twenty sixth or twenty seventh of September. First
he says twenty sixth, but immeditely afterwards he says twenty
seventh. He does say he learned that Pinkney was not at
Montgomery. He admits Pinkney knew nothing as to what
was going on between him and Champe. . It is suggested in
argument that Pinkney and Dent Bros. had conspired to saddle
a loss on defendant by exchanging checks and absenting them-
selves, but the evidence gives little force in the suggestion. The
check of Pinkney to Dent Bros. which was mailed to Charleston
by the same mail was promptly paid by defendant, and it was
apparent, if Dickinson's attention was called to both items, that
there had been a swapping of checks. Dent explains that this
arrangement was for the purpose of transferring so much of
his funds to another bank in Charleston for a business reason,
which he explains. It is not shown that either Pinkney or
Dent Bros. had any knowledge of the bank's condition. After
paying this check given Pinkney Dent Bros. still had left to
their credit over nine hundred dollars. What do the law books
say on this subject? Quoting from *First National Bank* v.
*Fourth Nat. Bank,* 77 N. Y. 320 (33 Am. Rep. 618) ; Clark &
Skyles on the Law of Agency, section 402*d,* at page 902, say:
"Suppose an agent receives for collection from the payee a sight
draft. No circumstance can make it his duty, in order to charge
the drawer, to present it for payment until the next day. He
has entered into no contract with the drawer, is not employed
or paid by him to render him any service, and owes him no duty
to protect him from loss. What is required to be done to charge
the drawer is simply a compliance with the condition attached
to the draft, as if written therein; and that condition is in
all cases complied with by presentation, demand and notice,
on the next day after receipt of the draft. But suppose the
agent, on the day he receives the draft, obtains reliable informa-
tion that the drawee must fail the next day, and that the
draft will not be paid unless immediately presented; what then
is the duty he owes his principal, whose interests for a compensa-

tion he has agreed with proper diligence and skill to serve in and about the collection of the draft? Clearly, all would say, to present the draft at once; and if he fails to do this, and loss ensues, he incurs responsibility to his principal; and yet the drawer would be charged if it was not presented until the next day." This modification of the general rule requiring only resonable diligence and care where the collecting bank knows of the depressed financial condition of the drawee or debtor, is recognized and enforced in *Commercial Bank* v. *Red River National Bank,* 8 N. Dak. 382, 389, 391. The court holds, a collecting bank, knowing of the depressed financial condition of the debtor is delinquent in its duty if it neglects to inform its customers of such vital condition and fails to take vigorous measures, under the circumstances, to secure payment. An agent is bound to exercise that degree of skill, care, and diligence which the nature of his undertaking calls for with reference to the time, place, and circumstances surrounding the undertaking." See note to *Minneapolis Co.* v. *Metropolitan Bank,* 77 Am. St. Rep. 613, 616. The same rule laid down by Clark and Skyles is, upon the same authority, affirmed in 1 Morse on Banks and Banking, section 219. Indeed this we perceive to be but the general law of agency. Under the circumstances of this case we think defendant was guilty of negligence in not either declining the agency to collect altogether or taking such vigorous measures as the facts demanded for the protection of its customers.

Now as to plaintiff's third proposition, that the defendant was guilty of negligence in forwarding the check directly to the drawee bank. It is practically conceded by counsel for defendant that the rule in this country, outside of New York, is that it is negligence for a collecting bank to send checks direct to the drawee bank. The cases so holding are the following: "*Loewenstein* v. *Bresler,* 109 Ala. 326 (1895); *Farley National Bank* v. *Pollock & Bernheimer* (Ala.) 39 So. Rep. 612 (1905); *O'Leary* v. *Abeles,* 68 Ark. 259 (1900); *German National Bank* v. *Burns,* 12 Colo. 539 (1889); *Drovers National Bank* v. *Anglo Amer. Prov. Co.,* 117 Ill. 100 (1886); *First National Bank* v. *Bank of Whittier,* 221 Ill. 319 (1906); *Anderson* v. *Rodgers,* 53 Kan. 542 (1894); *First National Bank* v. *Citizens Bank,* 123 Mich. 336 (1900); *Carson & Co.* v. *Fincher & Co.,*

129 Mich. 687 (1902) ; *Minneapolis Sash & Door Co.* v. *Metropolitan Bank,* 76 Minn. 136 (1899) ; *American Exchange Bank v. Metropolitan Bank,* 71 Mo. App. 451 (1897) ; *Western Wheeled Scraper Co.* v. *Sadilek,* 50 Neb. 105 (1897) ; *Bank of Rocky Mount* v. *Floyd,* 142 N. C. 187 (1906) ; *Bank* v. *Johnson,* 6 N. Dak. 180 (1896) ; *Commercial Bank* v. *Red River National Bank,* 8 N. Dak. 382 (1899) ; *Bank* v. *Goodman,* 109 Penn. St. 422 (1885) ; *Harvey* v. *Girard National Bank,* 119 Penn. St. 212 (1888) ; *Hazlett* v. *Com. National Bank,* 132 Penn. St. 118 (1890) ; *Wagner* v. *Crook,* 167 Penn. St. 259 (1895) ; *Givan* v. *Alexandria Bank* (Tenn.) 52 S. W. Rep. 923 (1898) ; *Winchester Milling Co.* v. *Bank of Winchester,* (Tenn.) 111 S. W. Rep. 248 (1908) ; *First National Bank of Corsicana* v. *City National Bank of Dallas,* 12 Tex. Civ. App. 318 (1896) ; *Evansville First National Bank* v. *Louisville Fourth National Bank,* 16 U. S. App. 1 (1893.) ; *Farwell* v. *Curtiss,* 8 Fed. Cases No. 4690 (1876)." The general rule deducible from these cases and as stated in 1 Morse on Banks and Banking, section 236, page 467, is that, "in this country the party who is to pay a check is not a suitable agent for its collection." Counsel for defendant criticise the cases cited, and endeavor to show how they differ from the case we have in hand, and how, as they view them, they are inapplicable. Of course they do differ in their facts and circumstances, but taken together, they do no more than state a general law of duty and obligation upon the part of a collecting agent to select suitable sub-agents in the execution of a contract of agency and they unite in holding, that, as a general rule a drawee bank is not a suitable agent for the collection of checks drawn on it. Two points of distinction are attempted to be drawn by counsel, between the cases cited and this case, namely, that it does not appear in most of those cases that the drawee bank was the only bank located in the place of the drawee, and that there was no evidence of a custom existing in the locality of the collecting banks of sending such collections direct to the drawee. Evidence was admitted in this case of such custom among the banks of Charleston, which was objected to, but admitted over the objection. It is argued that as the plaintiff had been a customer of the defendant bank for years and accustomed to do business in Charleston, and as he lived at Montgomery, where the drawee bank was located, and had

knowledge of the fact that the drawee was the only bank located there, he is chargeable with notice of that custom, and that when he sent the check in question to the defendant for collection, he must be deemed to have contracted with reference to that custom, and the usual method observed in making such collections, and bound thereby. This argument is not without force. But aside from it we are appealed to by counsel to disregard the general rule prevailing in this country, and to adopt what they regard as the better and more sensible one prevailing in England and New York, and, as it is claimed, enunciated in *Heywood* v. *Pickering*, 9 L. R. (Queen's Bench) 432; *Prideaux* v. *Criddle*, 10 Best and Smith, 524; *Indig* v. *National City Bank*, 80 N. Y. 100; *Briggs* v. *Central National Bank*, 89 N. Y. 184; *McIntosh* v. *Tyler*, 47 Hun. 99. Apropos to this argument we refer to the editorial note to *Anderson* v. *Rogers*, *supra*, 27 L. R. A. 248. The New York and English cases cited and relied upon by defendant's counsel are there considered and criticised. The editor, referring to *Bank* v. *Goodman*, and *Drover's National Bank* v. *Anglo Amer. Prov. Co.*, as supporting the proposition that a collecting bank which sends a check directly to the drawee by mail is liable in case the draft which was received in return proves uncollectible when the check would have been paid if duly sent for presentment at the counter, further observes, "Both of these cases also decided that a custom cannot be successfully set up as a justification for sending a check directly to the drawee bank by mail." He refers also to *Harvey* v. *Girard National Bank*, and *Hazlett* v. *Commercial National Bank*, *supra*, for the same proposition. In criticism of *McIntosh* v. *Tyler*, 47 Hun. 99, relied on by defendant's counsel, this annotator says: "This is a decision of the general term of the supreme court relying on *Indig* v. *National City Bank of Brooklyn* (1880) 80 N. Y. 100, and *Briggs* v. *Central Nat. Bank*, (1882) 89 N. Y. 182 (42 Am. Rep. 285), and refusing to follow the decisions of other states on the question." "But", says he "the court of appeal in neither of the cases thus relied upon as authority really decided that exact question." He then enters upon a more minute consideration of these two cases and concludes that "the decision of the general term * * * in reliance on the authority of these two cases is in itself the only direct authority in New York state to that effect. This

decision itself is weakened by the fact that it is based on cases which do not exactly support it." Of the English decisions this editor says: "In England the cases have not much discussed the question, but in several the practice of sending checks by mail to the drawee through the country clearing-house has been recognized, but the real question in controversy in nearly all of these cases has been the question of time of presentment." He further observes that the English cases stand on somewhat different footing from the American cases by reason of the recognized custom in respect to the country clearing-house in which the country banks are represented by London correspondents, and in conclusion he makes the following observations: "The result of the American decisions is entire unanimity in holding that it is not proper to send a check by mail directly to the drawee for payment, except in New York state, where, as shown above, the decision to the contrary cites as authority two other cases which do not exactly decide the question. Considering the great importance of New York decisions on commercial questions, it is unfortunate for the clearness of the law on this question that in New York cases are in any degree at variance with other American cases." Bolles says on this subject, 2 Bolles on Banking, page 548, "Once it was the universal custom to send checks and other instruments directly by mail to the drawee bank for payment; and this practice still prevails in some states. On the other hand, it has been condemned by many of them, unless there is no other bank in the place; or instructions or other circumstances attending the deposit justified the bank in sending to the drawee for payment. Wherever the more general rule prevails and is violated and the drawee bank fails having in its possession a sufficient fund belonging to the drawer to pay the check, he is discharged." The authorities cited by this writer for the "once universal custom" are mainly those relied upon by defendant's counsel. A few other New York and other cases are also cited in the note. The cases in which the rule "has been condemned" are those relied upon by the plaintiff in error and criticised by defendant's counsel. Our examination of the cases referred to satisfies us that Mr. Bolles is in error in saying that once the custom referred to was "the universal custom". The fact is otherwise, we think, for the cases condemning the custom cover the same period as the cases cited

by him for the proposition, and it is certain, we think, that a custom thus condemned by so many judicial decisions could never have become universal. In examining the cases cited by Mr. Bolles, showing this "universal custom", we are impressed with the decision in *National Revere Bank* v. *National Bank of the Republic*, 172 N. Y. 102. The particular point there decided, and effecting this case, is point six of the syllabus, namely, that "a bank which is the collecting agent of another does not cease to be such because it is the drawee upon which the drafts forwarded to it for collection are drawn." This is in accord with the general rule contended for by the plaintiff here, and the court says, to the discredit of *Briggs* v. *Central National Bank*, and *Indig* v. *National City Bank*, and other New York cases relied upon by the defendant, that "In this state a bank receiving commercial paper for collection is, in the absence of some special agreement, liable for a loss occasioned by a default of its correspondents or other agents selected by it to make the collection. Where a sub-agent collects but fails to pay over and becomes insolvent, such insolvency will not shield the collecting agent from liability for the loss." And at page 108, replying to the contention of counsel for the defendant, that as a matter of law the act of the defendant in sending the drafts to the bank where they were payable and upon which they were drawn, the drawee did not become the agent of the defendant, and referring to the case of *Indig* v. *National City Bank*, in support of the proposition, the court replied: "With respect to that case generally it may be said, as it has been said before by this court in the *St. Nicholas Bank Case, supra,* that it was a border case, the doctrine of which was not to be extended, and, indeed, it has been already explained and limited in *Briggs* v. *Central Nat. Bank,* 89 N. Y. 182. But no one will claim that it is not competent for the collecting bank to make the drawee bank in such a case its agent in the same way as if the paper was payable at some other place. If it had been shown in that case, as it was in this, that for several years before the transaction the drawee bank had been the collecting agent of the bank transmitting the paper, doubtless it would have been held that the relation of agency existed between the two banks. The court was careful in that case to emphasize the fact that there was no indorser on the paper, and that all that was to be

done was to demand payment. In the case at bar there was an indorser who has been discharged, and the consequence is that *prima facie* the plaintiff had been damaged in a sum equal to the face of the paper (*Potter* v. *Merchants' Bank*, 28 N. Y. 641), so that the distinction between that case and this is to be found in the wide difference in the facts. Moreover, the *Indig Case* does not really decide any such proposition as is claimed. It will be seen from the report that three members of the court concurred in the proposition now asserted. Three other members dissented entirely and the chief judge concurred with the three first mentioned on the question of damages and this· resulted in the reversal of the judgment below. Hence it is very obvious that the only question decided in that case was the point presented in the opinion relating to the question of damages." Here we have the highest court of New York, in a late case, decided in 1902, limiting and explaining, if not practically overruling the other New York cases relied upon by defendant's counsel.

But is there an exception to the general rule, where there is no other bank in the place? Bolles notes an exception in the section quoted from, predicating it upon *Wilson* v. *Carlinville National Bank*, 187 Ill. 222, and *First National Bank* v. *Citizens Savings Bank*, 123 Mich. 336, the cases cited and relied upon by defendant's counsel. ·It is also noted in 5 Cyc. 506, as based on the same decisions. But we think such an exception opposed to the weight of authority, and to reason. These and other decisions are reviewed and criticised in the well considered case of *Winchester Milling Co.* v. *Bank of Winchester,* (Tenn.) 111 S. E. Rep. 248, denying the exception, which, in an opinion already too long, we are disposed to adopt as expressive of our own views on the subject. The cases on which Cyc. bases the statement found at page 506, namely, that: "Some states which deny the legality of the rule permit the paper to be sent to the drawee when there is no other bank in the place known by the owner, and collection by a different method would be costly and inconvenient" are also reviewed; and that court says: "We do not think the text of Cyc., *supra,* sustained by the authorities cited." We are of the same opinion.

These authorities we think require an affirmance of plaintiff's third proposition; for in the face of all the information

Dickinson had about the condition of the drawee bank he took the risk of trusting Champe and his bank, to carry out their special agreement; sent the check directly to the drawee; gave no information to either Pinkney or Dent Bros., the makers of the check; and only sent a special messenger to Montgomery to recover the check, make demand of payment and protest, after the check had passed beyond his control, and after hearing from Champe in the afternoon, that the bank could not, or would not send the currency. The messenger failed in his mission, the check was never recovered, or returned to Pinkney, but was charged to Dent Bros., and the bank credited therewith in settlement with them by the special receiver after its failure. In other words the check was paid as between the drawee and Dent Bros. Must it not in law be treated as paid also, as between defendant and Pinkney? Has Pinkney any right of action against Dent Bros.? He lost that right when by the negligence of defendant the check was surrendered to the drawee, and charged to the makers.

The question remains can recovery be had on the common counts in *assumpsit* as for money had and received? Defendant's counsel say no. The defendant credited Pinkney and so advised him, but as it is claimed, subject to payment. If on presentation of the check in due course, payment had been refused by the drawee, and the check had been retained and returned to Pinkney, the defendant would, as a general rule, have been entitled to charge it back to Pinkney. But by employing an improper agent it lost the possession of the check and put it in the power of that agent to collect the money, and, as between it and the defendant, make a wrongful disposition of it. What right of action then has Pinkney? He has not the check with which to go back on Dent Bros. As to them the check is paid. Defendant was credited with the proceeds, and had the right to participate in the distribution of the assets of the defunct bank. Defendant took the check in the place of money, gave plaintiff credit, and until it returns the thing it got unimpaired, with all rights against all parties preserved, is it not chargeable with that check as a deposit in settlement with Pinkney, its customer? Its agent got that thing, disposed of it, credited it with the proceeds and charged Dent Bros.

We are of opinion that upon the case as made plaintiff may

recover on the common counts, for money had and received. High authority says, it is only necessary to show that defendant has obtained possession of money or received something· as money, which *ex aequo et bono,* he ought to refund. 2 Ency. Pl. & Prac. 1016. We have examined the cases cited for the proposition in a note, and we think they support the text, and our conclusion in this case. In *Lary* v. *Hart,* 12 Ga. 423, a note was intrusted to an agent, and he intrusted it to another to return it to the owner, who instead settled with the maker. In an action by the owner against his agent as for money had and received, recovery was denied, the court, however, observing, that "had he shown that Conner acted as the agent of Hart, in settling the note, the verdict might have been supported." In *Seavey* v. *Dana,* 61 N. H. 339, the court says: "The action for money had and received can be maintained against the defendant, if he received the note as money or its equivalent, or if he received the proceeds of the note. * * * the plaintiff could waive the tort, and maintain *assumpsit* for money had and received." 2 Greenleaf on Evidence, section 118, says: "What is money had and received. In regard to things treated as money, it has been held that this count may be supported by evidence of the defendant's receipt of bank-notes; or promissory notes; or credit in account, in the books of a third person; or a mortgage, assigned to the defendant as collateral security, and afterwards foreclosed and bought in by him; or a note payable in specific articles; or any chattel." *Mathewson* v. *Powder Works,* 44 N. H. 289, 291, a leading, and well considered case, and other cases cited support the text of Greenleaf. This case also says: "The rule that the action for money had and received lies only where one party has received, and has in his hands money which he has no right to retain, has been long since relaxed; and it is sufficient, to sustain the action, that something has been received by the defendant, which, under the circumstances of the case, ought, as between the parties, to be regarded as money." A check was held to be money, being treated as such, in *Spratt* v. *Hobhouse,* 4 Bing. 179, cited and quoted in the last New Hampshire case cited, at page 292. This action lies by a customer against a banker for a balance on settlement, or on proof that a certain sum has been received in so many different payments, and that a certain other sum has been paid

out in so many payments. 3 Rob. New Prac., 391. We think it unnecessary to dwell further on this point.

Our conclusion is that the court below erred, and that its judgment should be reversed, the verdict set aside, and a new trial awarded, and we will so order.

*Reversed and Remanded.*