M. S. STEADMAN, Appellant, v. LIVE STOCK NATIONAL BANK, Appellee.

BANKS AND BANKING: Collections—Negligence—Relying on Telephone Message. A bank which receives from a live-stock commission company a check on a local bank, payable to a nonresident shipper (for whom the receiving bank was acting as general collector), is not, as a matter of law, negligent if, in attempting to collect the check, it relies on the telephoned statement of the drawee bank that the drawer has no funds on deposit with which to pay the check, even though it is made to appear that the check would have been paid if it had been personally presented at later, but *unidentified,* times during the same or the following day.

Headnote 1:  7 C. J. pp. 610, 611 (Anno.)

*Appeal from Woodbury District Court.*—C. C. HAMILTON, Judge.

MARCH 17, 1925.

REHEARING DENIED JUNE 25, 1925.

ACTION at law, to recover proceeds of a shipment of live stock sold by the Ward Commission Company, of Sioux City, as agent of plaintiff, alleged to have been lost to the plaintiff through the negligence of defendant in failing to make collection from the Ward Commission Company of the amount received by said company from the sale of said shipment. At the close of plaintiff's evidence, on motion, verdict was directed for

defendant. Facts appear in the opinion. Plaintiff appeals.—
*Affirmed.*

*Wagner, Pike & Knoepfler,* for appellant.

*Burgess, Gill, Sammis & Boylan,* for appellee.

Arthur, J.—I. Appellant, Steadman, was manager of the Farmers' Shipping Association of Centerville, South Dakota, an association composed principally of farmers, whose object in maintaining the association was to sell their live stock on the market at Sioux City and elsewhere, the proceeds to be distributed among the farmers when the stock was sold. J. S. Thompson, president of the Bank of Centerville, was a member of the association, and his bank was the depository of funds of the association. Steadman, as manager of the association, took charge of the stock when it was brought in by the farmers to the yards at Centerville, and when there was sufficient for a carload, shipped the stock out to market. By arrangement previously made between the Bank of Centerville and appellee bank, the proceeds from shipments of stock from the vicinity of Centerville, when placed in appellee bank, should be credited to the account of the Bank of Centerville, and the Bank of Centerville would pay out the proceeds from the sale of stock to the farmers entitled thereto.

It appears further that there was an arrangement between the Bank of Centerville and appellee bank that appellee bank would watch the bulletin board at the stockyards, and thereby gain information of shipments of stock by the Centerville shippers, whose accounts, under the above-mentioned arrangement, should be credited to the account of the Bank of Centerville.

On July 6, 1920, appellant shipped a carload of hogs to Sioux City, for sale, consigned to the Ward Commission Company. The shipment arrived at the stockyards in Sioux City and was placed on the bulletin board July 7th, at 2:45 A. M. This carload of hogs was sold by the Ward Commission Company on July 7th for $2,568.99 net. On July 7th, after selling the stock, the Commission Company wrote its check, payable to appellee bank, for $2,568.99, the net proceeds of the sale of the hogs,

drawn on the Iowa State Savings Bank, where the Ward Commission Company carried its account; and the Commission Company rendered an account of the sale, which was received by appellant on July 8th. The check for $2,568.99, which was made out by the Commission Company for deposit in appellee bank to the credit of the Bank of Centerville, in pursuance of instructions from appellant so to do, was not by the Ward Commission Company deposited in appellee bank. It appears that, after the check was drawn, and before it went out of the office of the Commission Company, the Commission Company was advised that the Iowa State Savings Bank, on which the check was drawn, was refusing payment of its checks; and the Commission Company did not deposit the check. Sometime during the day of July 7th,—the exact time is not disclosed in the record,—Mr. Frederickson, cashier, or Mr. Sam, president of appellee bank, went to the office of the Commission Company and got the check, and communicated with the Iowa State Savings Bank by telephone, and was informed that there were no funds in the Ward Commission Company's account to pay the check. The Commission Company failed, and the check was not paid, except $513.80 received from the bankrupt estate of the Ward Commission Company.

II.   Appellant insists that the record presented questions of fact and of good faith for the jury, and that it was error in the trial court to direct verdict for appellee. The evidence offered consisted largely of statements made by Frederickson, cashier, and Sam, president of appellee bank, to Steadman and others, about a week after the transaction involved, testified to by Steadman and others, and the direct testimony of A. G. Walton, assistant cashier of the Iowa State Savings Bank, concerning the account of the Ward Commission Company in his bank, and production of the ledger account. Also, J. S. Thompson, president of the Bank of Centerville, and a member of the Farmers' Shipping Association, testified as to the nature of the business of his bank with the Live Stock National Bank, with respect to handling the business of the association between the two banks. In substance, the arrangement was that the Live Stock National Bank, being located at the stockyards, had special facilities for handling live-stock items, could watch the bul-

lctins, and be apprised of shipments of stock, and see to it that items for the Centerville bank would be credited on the day stock was sold; and that it was to the advantage of the Bank of Centerville to carry a live-stock account with the Live Stock National Bank; that, in pursuance of such arrangement, the Farmers' Shipping Association, through Steadman, its president, gave instructions to its salesmen to sell stock and deposit the proceeds in the Live Stock National Bank, for the credit of the Bank of Centerville, for the credit of the association.

Steadman, after stating that the purpose of his organization was to buy and ship live stock, and how the business was handled, testified that he shipped largely to the Ward Commission Company of Sioux City, and instructed that company to deposit the funds in the Live Stock National Bank in the account of the Bank of Centerville; that he shipped to said commission company on an average of about two loads per week; that account of sale of the carload of stock in controversy was received by him on the morning of the 8th of July; that he had first information that the proceeds of the shipment had not been placed to the credit of the association's account with the Bank of Centerville, on the 10th of July; that, on the 16th, he came to Sioux City and interviewed Ward Bros., Frederickson, cashier, and Sam, president of appellee bank, concerning the proceeds of the shipment; that he first talked with Ward Bros., and was told that the check had not been paid because the Iowa State Savings Bank, upon which it was drawn, began dishonoring their checks on July 7th; that Ward said he was out of funds, and that he had no funds to pay with; that the check in controversy was in possession of appellee bank at that time; that Frederickson stated that they had found out that the financial condition of the Ward Commission Company was not good, and they had gotten the check on the 7th of July, to get their money for them; that, after getting the check, Frederickson stated, he telephoned to the Iowa State Savings Bank, and was told that there were no funds to pay the check; that his talk with Mr. Sam was, in substance, the same as with Frederickson.

Two men who were with Steadman and heard the conversations with the officers of appellee bank, testified in substance the same as Steadman.

The Ward Commission Company did its business with the Iowa State Savings Bank. Walton, assistant cashier of that bank, produced the ledger account of the Ward Commission Company, and testified concerning the account. The account and Walton's testimony seem to show as follows: That, on July 6th, at some time during that day, the account was overdrawn $4,964.72; that the account was replenished so that, at the close of business on the 6th, there was a balance in favor of the Ward Commission Company of $1,570.35; that, at the opening of business on July 7th, there was a balance of $1,570.35, which was increased by deposits of $1,273.73 and $11,296.84, and reduced by payment of checks aggregating $4,049.59, so as to leave a balance at the close of business on July 7th, of $10,100.33. At the opening of business on the morning of July 8th, there was a balance of $10,100.33, which was increased by a deposit of $984.95, reduced by payment of items as follows: cashier's checks for $4,896.86, $200 and 55 cents, in payment of notes of the Ward Commission Company owed to the bank, and Ward Commission Company checks for $2,855.52 and $794.32,—leaving a balance at the close of business on July 8th of $2,338.03, money which, the evidence shows, was a fund involved and tied up in litigation, and for which the bank issued and held cashier's check, which it retained. It appears that the account fluctuated considerably on the 7th by deposits and payment of checks; that, at the opening of business, there was a balance of $1,570.35; that, sometime during the day, there was a balance of over $11,000, and at the close of business a balance of $10,100.33. The account was closed on July 8th or 9th, with the bank holding the cashier's check for $2,338.03 to take care of the fund which the assistant cashier testified was tied up in litigation, and not subject to be checked out.

Walton, assistant cashier, was asked, on direct examination, whether, if a check had been presented during the day of the 7th, when there was a balance of $10,100.33, for less than that amount, it would have been paid; and he answered that it would. Walton testified that checks of the Ward Commission Company went to protest on the 7th; that a check of $7,000 issued by the Ward Commission Company in favor of the Hudson

State Bank, drawn on the Iowa State Savings Bank, was presented on the 7th, and protested for nonpayment.

III.     The action is predicated on alleged negligence of appellee bank in handling the check given by the Ward Commission Company in payment of the carload of hogs. Appellant's claim is that, as a result of negligence of appellee bank, the proceeds of the sale of said carload of hogs, except $513.80, received from the bankrupt estate of the Ward Commission Company, were lost to appellant. The negligence charged, in substance, was in not presenting the check for payment to the drawee bank in person, by one of its officers or a messenger, and demanding payment and keeping such demand good by continuous presentation of the check, instead of accepting the answer of the drawee bank over the telephone, that there were no funds in the Ward Commission Company's account with which to pay the check. It is charged that appellee bank, under the circumstances, did not use due diligence in presenting said check and undertaking to make collection, in view of its knowledge of the financial embarrassment of the commission company; that it was negligent in failing to present said check for payment when there were funds on hand in drawee bank sufficient to pay same, and in failing to notify appellant, or the Bank of Centerville, of its failure to make collection of the check and of the failing circumstances of the commission company, and in retaining the check and failing to take any action to make collection, or to turn it over to appellant, so that he might take steps for the collection of same.

Appellant insists that appellee bank, with its knowledge of the financial embarrassment of the commission company, and under the arrangement by appellee bank with the Bank of Centerville, owed a duty to appellant to do more than get the check and inquire over the telephone about its payment; that appellee was not justified in accepting, over the telephone, the statement of the Iowa State Savings Bank that there were no funds in the Ward Commission Company's account with which to pay the check; that it was not sufficient discharge of the bank's duty to telephone the drawee bank, on receipt of the check, and do nothing more; that, with their knowledge of banking business, the officers of appellee bank knew that, although there might not

have been sufficient funds to pay the check when they telephoned, the account was likely to be replenished, and there might be sufficient funds later in the day, or on the following day, to pay the check; and that, with such knowledge, and knowledge of the failing condition of the commission company, it owed appellant a greater duty than to merely telephone and thereafter remain inactive, without notifying appellant or the Bank of Centerville of the information received by telephone; that, in view of the fact that there was a balance in the account sufficient to pay the check during part of the day of July 7th, and at the opening of business on the morning of the 8th, it was not improbable that, if appellee bank had sent a messenger, or one of its officers had gone to the drawee bank and presented the check in person, it would have received the funds.

Appellee takes the position that it discharged its duty to appellant, and even more, in handling the check as it did, in view of the facts. Appellee contends further that, in going after the check, instead of waiting for it to come along in due course of business, it did more than its duty, because it acted as a voluntary, gratuitous agent, and is not liable; that the Ward Commission Company never deposited, and appellee bank never received, the check in due course of business; but that appellee bank got the check from the office of the Ward Commission Company for the purpose of endeavoring to collect same for the benefit of appellant after the maker failed; that the check was never put in circulation in due course as negotiable paper, and as between appellant and appellee, it did not come into the possession of appellee subject to the provisions of the Negotiable Instrument statutes; that, when the check was received by appellee bank, it had already been dishonored by the bank on which it was drawn; and that there never was a time, after the check was received by it, when there were funds to pay it, or when it could have been collected.

IV.   The check did not come to appellee bank in regular course of business. It was not deposited by the Ward Commission Company, and was never deposited in appellee bank. The Ward Company knew that its checks were being dishonored, and so stated to Frederickson, cashier of appellee bank, when he went to the office of the Ward Commission Company to get the check.

Some days later, when Steadman came to Sioux City and talked with members of the Ward Commission Company, he was told by them that the Iowa State Savings Bank had stopped paying their checks on the 7th, because they did not have funds in the bank with which to pay them. The $7,000 check payable to the Hudson State Bank went to protest for nonpayment on the 7th. Whether the officers of appellee bank knew that the Iowa State Savings Bank had refused payment of the $7,000 check, the record does not disclose; but it appears that appellee bank had knowledge of the failing condi*·-· of the Ward Commission Company, from some source, and for that reason one of its officers went to the office of the Ward Commission Company to procure this check and endeavor to collect it, instead of waiting for the check to come to the bank in the regular course of business. The Commission Company gave the check over to Frederickson, who telephoned to the drawee bank that he had the check, and was informed that there were no funds in the account of the Commission Company to pay it. At what time of the day on the 7th of July the Commission Company handed the check to Frederickson, whether during or after banking hours, is not disclosed by the record.

Did appellee bank, through its cashier, discharge its full duty in handling the check as it did, or was it guilty of negligence which resulted in the injury complained of?    -

From the testimony of Walton and the ledger account it appears that there were times during July 7th or 8th, before the account was closed out on the 8th, when there were funds enough on hand to pay the check, and at other times there were not funds enough to pay the check. The exact time or times during said days that the balances accumulated sufficiently to pay the check are not disclosed by the record. Walton testified that it was the rule of banking to refuse payment of a check if there were not sufficient funds carried in the account to pay it in full; and it seems to be conceded by counsel that this is the approved rule. It may be stated from the record that, with the prior information which the officers of appellee bank had of the failing condition of the Ward Commission Company, Frederickson, cashier, went to the office of the Ward Commission Company and procured the check for the purpose of protecting the

interests of its customer.   The statement of Mr. Sam, president
of appellee bank, concerning the check, as testified to by one of
appellant's witnesses, was:

"Mr. Sam stated he had gotten the check from Ward to see
what could be done about collection, and that the bank had
phoned to the Iowa State Savings Bank and they had been in-
formed that there were no funds in the account; and they did
not take the check up and present it in the usual way. , Mr. Sam
or Mr. Frederickson said that he got the check on the 7th, when
they found Mr. Ward was having financial trouble.   I do not
recall the exact conversation with Mr. Sam as to their course
of business or business relation with this Shippers' Association
or the Bank of Centerville, but it was to the effect that they
were regular shippers there, and they were wanting to take care
of their customer,—protect their interests by collecting for this
shipment."

Counsel for appellant argue that the officers of appellee
bank recognized an obligation to him to make this collection, and
that the protection of his interests demanded action beyond the
ordinary presentation of the check, under the rules of the law
merchant and clearing house, which might have given until the
following day to present the check; that prudence and good faith
demanded at least that the bank send a messenger with this
check to the drawee bank, and that it either follow the matter
up and secure the funds that were in the account on the after-
noon of the 7th and in the forenoon of the 8th, or that it advise
the plaintiff or the Bank of Centerville, so that it might have
taken some vigorous steps to secure payment of the check or
otherwise recover the proceeds of the stock.   In support of this
position, counsel cite *Pinkney v. Kanawha Valley Bank*, 68 W.
Va. 254 (32 L. R. A. [N. S.] 987); *First Nat. Bank v. Fourth
Nat. Bank*, 77 N. Y. 320 (33 Am. Rep. 618); *Anderson v.
Rodgers*, 53 Kan. 542 (36 Pac. 1067); *Wingfield v. Security
Nat. Bank*, 38 S. D. 491 (162 N. W. 309).   A fair sample of
the substance of the holdings in these cases is found in the case
of *Pinkney v. Kanawha Valley Bank,* supra; where it was con-
tended that the only duty resting upon the bank was to make
presentation under the rules of the law merchant.   The West
Virginia court said:

"The court holds, a collecting bank, knowing of the depressed financial condition of the drawee or debtor, is delinquent in its duty if it neglects to inform its customers of such vital condition and fails to take vigorous measures, under the circumstances, to secure payment. An agent is bound to exercise that degree of skill, care, and diligence which the nature of his undertaking calls for with reference to the time, place, and circumstances surrounding the undertaking."

It is urged by appellant that, in view of the fact that there was a balance in the account of the Commission Company at some time during July 7th and at the opening of business on the morning of the 8th, it was the duty of appellee bank to send a messenger, or one of its officers, to the drawee bank, to present the check in person and keep it good by continuous presentation. Conceding the rule announced in the cases cited to be sound, that "an agent is bound to exercise that degree of skill, care, and diligence which the nature of his undertaking calls for," we think appellee bank was not lacking in diligence. It did endeavor to protect its customer, outside of the regular course of business, by procuring the check before it would reach the bank in regular course, and presenting the check for payment. Evidently the Ward Company thought that the check would not be paid. It had taken no steps to expedite its presentation. Ward stated to Steadman, in a later conversation, that the company had no funds with which to pay the check. It is a matter of common knowledge that business of important character is transacted by telephonic communication. We think the officers of appellee bank were justified in accepting the statements of the drawee bank, over the telephone, that the check would not be paid because of want of funds in the account to pay it.

The complaint that appellee bank was negligent in not taking some active steps to collect the check, after payment had been refused, or that it did not notify appellant or the Bank of Centerville immediately that payment had been refused, so that they might proceed to collect the check in some manner, is not well founded, for the reason that it was not shown that any procedure would have effected collection of the check.

We think the record did not present issues of fact for submission to the jury, and that direction of verdict in favor of appellee was not error. To have submitted the case would have been to allow the jury to arrive at a verdict in a field of pure speculation.

The judgment of the court below is affirmed.—*Affirmed.*

FAVILLE, C. J., and EVANS and ALBERT, JJ., concur.